UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IZALIA V.,[1] | ) | CIVIL ACTION NO. 4:22-CV-1819 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| MARTIN O'MALLEY,[2] | ) | |
| *Commissioner of the Social Security* | ) | |
| *Administration* | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

Izalia V. ("Plaintiff") is an adult who lives in the Middle District of Pennsylvania. She seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income under Title XVI of the Social Security Act. Jurisdiction is conferred on this Court pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1383(c)(3).

This matter is before us upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. After reviewing the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States recommends that federal courts refer to social security plaintiffs by their first name and last initial. We adopt this recommendation.

[2] Martin O'Malley became the Commissioner of Social Security on December 20, 2023. He is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g).

parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, we find the Commissioner's final decision is supported by substantial evidence. Accordingly, we will affirm the Commissioner's final decision.

## II.   BACKGROUND AND PROCEDURAL HISTORY

On April 18, 2019, Plaintiff protectively filed an application for supplemental security income under Title XVI of the Social Security Act. (Admin. Tr. 47; Doc. 11-2, p. 48).   In this application, Plaintiff alleged she became disabled on June 1, 1998, when she was 2 years old, due to the following conditions: sickle cell anemia, bipolar disorder, multiple personality disorder, and anxiety. (Admin. Tr. 345; Doc. 11-6, p. 54). Plaintiff was twenty-three years old when she filed her application for benefits. (Admin. Tr. 61; Doc. 11-2, p. 62). Plaintiff alleges that the combination of these conditions affects her ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, concentrate, and use her hands. (Admin. Tr. 373; Doc. 11-6, p. 82). Plaintiff has a tenth-grade education. (Admin. Tr. 344; Doc. 11-6, p. 55). Plaintiff has no past relevant work.

On September 6, 2019, Plaintiff's application was denied at the initial level of administrative review. (Admin. Tr. 47; Doc. 11-2, p. 48). On February 3, 2020, it

was denied on reconsideration. *Id.* On April 30, 2020, Plaintiff requested an administrative hearing. *Id.*

On June 7, 2021, Plaintiff and her counsel, participated in a telephone hearing before Administrative Law Judge Gerard Langan (the "ALJ"). (Admin. Tr. 78; Doc. 11-2, p. 79).[3] On August 26, 2021, the ALJ issued a decision denying Plaintiff's application for benefits. (Admin. Tr. 62; Doc. 11-2, p. 63). On September 27, 2021, Plaintiff requested that the Appeals Council of the Office of Disability Adjudication and Review ("Appeals Council") review the ALJ's decision. (Admin. Tr. 271; Doc. 11-4, p. 87). Along with her request, Plaintiff submitted new evidence that was not available to the ALJ when the ALJ's decision was issued. (Admin. Tr. 14-38, 69-77; Doc. 11-2, pp. 15-39, 71-78).

On September 12, 2022, the Appeals Council denied Plaintiff's request for review.  (Admin. Tr. 1-4; Doc. 11-2, pp. 2-5). Regarding the "new" evidence, the Appeals Council wrote:

> You submitted medical records from UPMC Hillman Cancer Center dated July 21, 2021 to August 17, 2021 (9 pages). We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence.

---

[3] There was also a hearing on October 28, 2020. During that proceeding, Plaintiff testified she was in the process of securing representation. The hearing was therefore rescheduled.

You submitted medical records from UPMC Hillman Cancer Center dated September 13, 2021 to October 11, 2021 (18 pages); medical records from River Valley Health & Dental dated September 24, 2021 to December 22, 2021 (7 pages). The Administrative Law Judge decided your case through August 26, 2021. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before August 26, 2021.

If you want us to consider whether you were disabled after August 26, 2021, you need to apply again.

(Admin. Tr. 2; Doc. 11-2, p. 3).

On November 15, 2022, Plaintiff filed a complaint in the district court. (Doc. 1). In the complaint, Plaintiff alleges that substantial evidence does not support the ALJ's decision denying her application, and that his decision is contrary to settled law. (Doc. 1, ¶¶ 17, 18). As relief, Plaintiff requests that the court award benefits, or in the alternative remand this matter to the Commissioner for a new hearing with instructions to render a timely decision. (Doc. 1).

On January 25, 2023, the Commissioner filed an answer. (Doc. 10). In the answer, the Commissioner maintains that the decision denying Plaintiff's application is correct and in accordance with the law and regulations, and that substantial evidence supports the findings of fact therein. (Doc. 10, ¶ 8). Along with his answer, the Commissioner filed a certified transcript of the administrative record. (Doc. 11).

Page 4 of 52

Plaintiff's Brief (Doc. 14), the Commissioner's Brief (Doc. 15), and Plaintiff's Reply (Doc. 16) have been filed.  This matter is now ready to decide.

## III.   LEGAL STANDARDS

Before looking at the merits of this case, it is helpful to restate the legal principles governing Social Security Appeals, including the standard for substantial evidence review, and the guidelines for the ALJ's application of the five-step sequential evaluation process. We will also discuss the standards for evaluating whether a claimant meets or medically equals a listing, articulating whether the combination of a claimant's impairments meets a listing, and considering the persuasiveness medical opinions and prior administrative medical findings.

### A. SUBSTANTIAL EVIDENCE REVIEW – THE ROLE OF THIS COURT

A district court's review of ALJ decisions in social security cases is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.[4] Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] Substantial evidence is

---

[4] *See* 42 U.S.C. § 1383(c)(3); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

[5] *Pierce v. Underwood,* 487 U.S. 552, 565 (1988).

less than a preponderance of the evidence but more than a mere scintilla.[6] A single piece of evidence is not substantial if the ALJ ignores countervailing evidence or fails to resolve a conflict in the record.[7] In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence."[8] When determining if substantial evidence supports the Commissioner's decision under sentence four of 42 U.S.C. § 405(g), the court may consider any evidence that was in the record that was made before the ALJ.[9]

The Supreme Court has underscored the limited scope of district court review in this field, noting that:

_____

[6] *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

[7] *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).

[8] *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

[9] *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001) ("when the Appeals Council has denied review the district court may affirm, modify, or reverse the Commissioner's decision, with or without a remand based on the record that was made before the ALJ (Sentence Four review)."). The claimant and Commissioner are obligated to support each contention in their arguments with specific reference to the record relied upon. L.R. 83.40.4; *United States v. Claxton*, 766 F.3d 280, 307 (3d Cir. 2014) ("parties . . . bear the responsibility to comb the record and point the Court to the facts that support their arguments."); *Ciongoli v. Comm'r of Soc. Sec.*, No. 15-7449, 2016 WL 6821082 (D.N.J. Nov. 16, 2016) (noting that it is not the Court's role to comb the record hunting for evidence that the ALJ overlooked).

Page 6 of 52

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. *T-Mobile South, LLC* v. *Roswell*, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid.*; see, *e.g.*, *Perales*, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison*, 305 U.S. at 229, 59 S.Ct. 206. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).[10]

To determine whether substantial evidence supports the final decision, the court must decide not only whether "more than a scintilla" of evidence supports the ALJ's findings, but also whether those findings were made based on a correct application of the law.[11] In doing so, however, the court is enjoined to refrain from

---

[10] *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).

[11] *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

trying to re-weigh evidence and "must not substitute [its] own judgment for that of the fact finder."[12]

Furthermore, meaningful review cannot occur unless the final decision is adequately explained. As the Court of Appeals has noted on this score:

> In *Burnett* [*v. Comm'r of Soc. Sec.*], we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable judicial review. [220 F.3d 112, 120 (3d. Cir. 2000)]; *see Jones v. Barnhart*, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "*Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." *Jones*, 364 F.3d at 505.[13]

## B. Standards Governing the ALJ's Application of The Five-Step Sequential Evaluation Process

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[14] To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible

---

[12] *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014).

[13] *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009).

[14] 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

to do his or her previous work or any other substantial gainful activity that exists in the national economy.[15]

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.[16] Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").[17]

Between steps three and four, the ALJ must also assess a claimant's RFC. RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."[18] In making this assessment, the ALJ considers all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.[19]

---

[15] 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

[16] 20 C.F.R. § 416.920(a).

[17] 20 C.F.R. § 416.920(a)(4).

[18] *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 416.920(e); 20 C.F.R. § 416.945(a)(1).

[19] 20 C.F.R. § 416.945(a)(2).

At steps one through four, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her from engaging in any of his or her past relevant work.[20] Once this burden has been met by the claimant, it shifts to the Commissioner at step five to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.[21]

### C. STANDARDS FOR EVALUATION AND ARTICULATION OF WHETHER AN IMPAIRMENT MEETS OR MEDICALLY EQUALS A LISTING AT STEP THREE

At step three of the sequential evaluation process, the ALJ considers whether (singly or combined) the claimant's medically determinable impairments meet or medically equal the severity of one of the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").[22] This inquiry functions to identify those claimants whose medical impairments are so severe they

---

[20] 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating 42 U.S.C. § 423(d)(5) by reference); 20 C.F.R. § 416.912(a); *Mason*, 994 F.2d at 1064.

[21] 20 C.F.R. § 416.912(b)(3); *Mason*, 994 F.2d at 1064.

[22] 20 C.F.R. § 416.920(a)(4)(iii).

would be found disabled regardless of their vocational background, making further inquiry unnecessary.[23]

At this step, the claimant bears the burden of producing medical findings that show his or her impairments meet or medically equal a listed impairment.[24] To meet this burden, the claimant must establish that he or she meets or medically equals *all* requirements of the relevant listing.[25] An impairment, no matter how severe, that meets or equals only some of the criteria for a listed impairment is not enough.[26] The requirements set forth in the Listing of Impairments are strictly construed because meeting or equaling a listing at step three results in an automatic finding of disability.

An impairment is "medically equivalent to a listed impairment in appendix 1 if it is at least equal in severity and duration to the criteria of any listed impairment.[27]

---

[23] 20 C.F.R. § 416.925(a) (explaining that the Listing of Impairments "describes for each of the major body systems impairments that we consider to be severe enough to precent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."); *Sullivan v. Zebley*, 439 U.S. 521, 532 (1990) ("The Secretary has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. . . . The reason for this difference between the listings' level of severity and the statutory standard is that, for adults, the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.").

[24] *Burnett*, 220 F.3d at 120 n.2.

[25] *Sullivan*, 493 U.S. at 531.

[26] *Id.*

[27] *Id.*

An ALJ may find an impairment medically equivalent to a listing in one of three ways outlined in the Commissioner's regulations.[28]

At the hearing level, the ALJ decides whether a claimant's impairments meet or medically equal a listing. The ALJ "must base his or her decision about whether the individual's impairment(s) medically equals a listing on the preponderance of the evidence in the record."[29] To support a finding that an individual is disabled based on medical equivalence at step 3, the record must contain evidence from a medical source designated by the Social Security Administration.[30]

The general rule in Social Security cases is that an ALJ must articulate his findings in a written decision with sufficient particularity to permit meaningful review. This general rule applies at step three. However, where an ALJ's conclusion at step three is not adequately articulated, courts may review the ALJ's entire decision before determining whether remand is required.[31] Consistent with this

---

[28] 20 C.F.R. § 416.926(b).

[29] SSR 17-2p, 2017 WL 3928306, at *3.

[30] *Id.* (explaining to support disability based on medical equivalency, the record must contain a supportive administrative finding, opinion, or report from a medical consultant, psychological consultant, medical expert, or  member of Appeals Council's medical support staff.)

[31] *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (affirming the Commissioner's final decision despite a lack of articulation at step three where the "ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate

practice, the Social Security Administration issued policy guidance instructing that if an ALJ concludes that the combination of a claimant's impairments *do not* equal a listing, he or she is not required to articulate the basis for this determination in the step three section of the decision because "[a]n adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step three."[32] Nonetheless, for an unarticulated medical equivalency finding to be upheld an ALJ's decision as a whole "must still enable this court to follow the ALJ's reasoning in determining that Plaintiff's impairment is not the medical equivalent of the listing" Plaintiff alleges on appeal.[33] If it does not, remand is required.

---

factors in reaching the conclusion that Junes did not meet the requirements for any listing, including Listing 3.02A.")

[32] *Id.* at *4; *see also*, *Flores v. Kijakazi*, No. 23-3225, 2024 WL 667243, at *9 & n.35 (E.D. La. Jan 26, 2024) (comparing *Taylor v. Kijakazi*, No. 20-88, 2021 WL 4190876, at *2 (N.D. Ind. Sept. 15, 2021), and *Gibson v. Kijakazi*, 643 F. Supp.3d 78, 88-89 (D.D.C. 2022) with *Kathleen C. v. Kijakazi*, No. 21-5035, 2023 WL 1767485, at *3-4 (E.D. Wash. Jan 23, 2023)) *report and recommendation adopted*, 2024 WL 663655 (E.D. La. Feb. 16, 2024).

[33] *Id.* at *9 & n. 37 (citing *Peak v. Comm'r of Soc. Sec.*, No. CV 18-11143, 2019 WL 2420280 (E.D. Mich. May 23, 2019), *report and recommendation adopted*, 2019 WL 2417430 (E.D. Mich. June 10, 2019)).

### D.    STANDARDS GOVERNING AN ALJ'S EVALUATION OF MEDICAL OPINIONS AND PRIOR ADMINISTRATIVE MEDICAL FINDINGS

When deciding whether to grant or deny an application for benefits, an ALJ is required to consider "all evidence" in the case record.[34] Social Security case records often include medical opinions and prior administrative medical findings.[35] The framework governing an ALJ's consideration of medical opinions and prior administrative medical findings is set forth in 20 C.F.R. § 416.920c.

Under this regulation, an ALJ will "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."[36] However, when medical opinions and prior administrative medical findings conflict, "the ALJ is not only entitled but required to choose between them."[37] That choice, is guided by the ALJ's consideration of the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of treatment, frequency of examination, purpose of the treatment relationship,

---

[34] 20 C.F.R. § 416.920(a)(3).

[35] The Commissioner's regulations also carefully define these types of evidence. 20 C.F.R. § 416.902(d) (defining medical source); 20 C.F.R. § 416.913(a)(2) (defining the types of statements that are medical opinions); 20 C.F.R. § 416.913(a)(5) (defining prior administrative medical finding).

[36] 20 C.F.R. § 416.920c(a).

[37] *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

Page 14 of 52

extent of the treatment relationship, and examining relationship); and (4) specialization.[38] The ALJ may also consider any other factors that "tend to support or contradict" a medical opinion or prior administrative medical finding, including but not limited to: a source's familiarity with the other evidence in the claim, his or her understanding of the disability program and policies, and whether new evidence received after the opinion or finding was issued makes the opinion or finding more or less persuasive.[39] Although all relevant factors must be considered, supportability and consistency are the most important factors when evaluating an opinion or finding's persuasiveness.[40]

The ALJ also has an obligation to articulate these findings in a particular way, and with enough specificity so that a reviewing court may know the basis for the decision.[41] Remand may be required where an ALJ's findings are not adequately articulated, or where substantial probative evidence was disregarded for improper reasons.[42]

---

[38] 20 C.F.R. § 416.920c(c).
[39] 20 C.F.R. § 416.920c(c).
[40] 20 C.F.R. § 416.920c(a).
[41] 20 C.F.R. § 416.920c(b); *Cotter*, 642 F.2d at 705.
[42] *Plummer*, 186 F.3d at 429 (explaining that "an ALJ is not free to employ her own expertise against that of a physician who presents competent medical evidence." The ALJ may "choose whom to credit, but 'cannot reject evidence for no reason or for the wrong reason.'") (quoting *Mason*, 994 F.2d at 1066).

## IV.   DISCUSSION

Plaintiff raises the following two broad issues in her statement of errors:

I.      The ALJ's finding, that Plaintiff's combined impairments did not equal the severity of a listing impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, is not supported by substantial evidence.

II.     The ALJ's RFC assessment is not supported by substantial evidence because it exceeds the limitations of all medical opinions and medical evidence of record.

(Doc. 14, p. 7) (boldface omitted).

We construe Plaintiff's briefs as raising the following seven issues:

(1)     Substantial evidence does not support the ALJ's conclusion at step three because the ALJ did not adequately articulate why he denied Plaintiff's post-hearing request for further development of the record.

(2)     Substantial evidence does not support the ALJ's conclusion at step three because the ALJ did not adequately articulate why the combination of Plaintiff's sickle cell anemia and mental health-related impairments were not equivalent to any mental impairment listing (hereinafter listings 12.00 *et seq.*).

(3)     Substantial evidence does not support the ALJ's conclusion at step three that Plaintiff did not meet listings 12.04, 12.06 and 12.08 because he incorrectly concluded that Plaintiff had only "moderate" difficulty interacting with others and "mild" difficulty adapting and managing herself.

(4)     Substantial evidence does not support the ALJ's conclusion that Plaintiff did not meet listing 7.05 because the ALJ did not articulate his reasoning.

(5)     Substantial evidence does not support the RFC because the ALJ did not discuss Plaintiff's education records from third grade and ninth grade before excluding limitations relating to periodic breaks, frequent

absences, difficulty following rules, difficulty responding appropriately to criticism, and being off task.

(6)     Substantial evidence does not support the RFC because the ALJ did not articulate why limitations relating to periodic breaks, frequent absences, difficulty following rules, difficulty responding appropriately to criticism, and being off task were excluded.

(7)     Substantial evidence does not support the RFC because ALJ deemed Dr. Kneifati's opinion unpersuasive for improper reasons.

(Docs. 14, 16).[43]

---

[43] In Social Security cases, all arguments raised must be clearly presented in a claimant's statement of errors, and new arguments should not be raised for the first time in a reply brief. LR 83.40.4(b) (requiring a statement of errors in the opening brief); LR 7.7 (explaining reply briefs should address "matters argued in a brief in opposition"). Issues properly raised must also be adequately developed, include citation to the *specific* portion of the record relied on, and be supported with citations to statutes, regulations, and cases. LR 83.40.4(c). In practice, these requirements ensure that all parties are placed clearly on notice of a movant's arguments and will have an opportunity to meaningfully respond. They also ensure that the Court will be able to clearly identify and review each argument.

Although we do not demand perfection, a party that does not substantially comply with these rules runs the risk that arguments not raised in their statement of errors, underdeveloped and supported arguments, and new arguments raised for the first time in a reply brief, may be deemed waived. Although it would be well within our discretion to deem several of Plaintiff's arguments waived. We will, however, only deem one argument waived. Regarding the second error alleged in her statement of errors, Plaintiff suggests that the RFC assessment includes a lesser degree of functional limitation than *all* medical opinions of record. This issue is entirely undeveloped. Plaintiff only specifically discusses one source's medical opinion (Dr. Kneifati's) in her brief. Therefore, we construed the brief as arguing that this opinion was deemed unpersuasive for improper reasons.

### A.    THE ALJ'S DECISION DENYING PLAINTIFF'S APPLICATION

In his August 2021 decision, the ALJ evaluated Plaintiff's application at steps one through five of the sequential evaluation process.

At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity at any point between April 18, 2019 (Plaintiff's application date) and August 26, 2021 (the date the ALJ decision was issued) ("the relevant period"). (Admin. Tr. 49; Doc. 11-2, p. 50).[44]

At step two, the ALJ found that, during the relevant period, Plaintiff had the following medically determinable severe impairments: sickle cell anemia, systemic inflammatory response syndrome ("SIRS"), bipolar disorder, depression, multiple personality disorder, and anxiety. (Admin. Tr. 49; Doc. 11-2, p. 50).

At step three, the ALJ found that, during the relevant period, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Admin. Tr. 49-52; Doc. 11-2, pp. 50-53).

---

[44] Plaintiff filed a title XVI application only. Under title XVI, there is no retroactivity of payment. SSR 18-01p, 2018 WL 4945639. Therefore, Plaintiff's protective filing date is the earliest possible date that the claimant can receive benefits under title XVI.

Between steps three and four, the ALJ assessed Plaintiff's RFC. The ALJ found that, during the relevant period, Plaintiff retained the RFC to engage in light work as defined in 20 C.F.R. § 416.967(b) except:

> she can frequently climb ramps and stairs and occasionally climb ladders and scaffolds. She should avoid unprotected heights and industrial machinery. The claimant can tolerate occasional exposure to temperature extremes, humidity, and environmental irritants, such as dusts, odors, fumes, and gases. The claimant is able to understand, retain, and carry out simple instructions. She is capable of occasional decision-making with respect to work related activities. The claimant can engage in occasional interaction with co-workers and supervisors, but she should avoid interaction with the public except for incidental contact, such as providing directions to the restroom or a department in a larger facility. The claimant should avoid group, team, or tandem work activities.

(Admin. Tr. 52; Doc. 11-2, p. 53).

At step four, the ALJ found that, during the relevant period, Plaintiff had no past relevant work. (Admin. Tr. 61; Doc. 11-2, p. 62).

At step five, the ALJ found that, considering Plaintiff's age on her application date, education and work experience, Plaintiff could engage in other work that existed in the national economy. (Admin. Tr. 61-62; Doc. 11-2, pp. 62-63). To support his conclusion, the ALJ relied on a vocational expert's testimony and cited the following three (3) representative occupations: Garment Folder, DOT #789.687-066; Marker, DOT #209.587-034; and Small Product Assembler, DOT #706.684-022. *Id.*

**B.** **WHETHER REMAND IS REQUIRED BECAUSE THE ALJ DID NOT ARTICULATE WHY HE DENIED PLAINTIFF'S POST-HEARING REQUEST FOR ADDITIONAL DEVELOPMENT OF THE RECORD**

Plaintiff concluded her post-hearing brief by speculating "that a medical expert who would carefully review all of the evidence of record should conclude that the severity of the claimant's impairments in combination meet or equal a listed impairment." (Admin. Tr. 512-513; Doc. 11-6, pp. 221-222). The ALJ acknowledged that he received and considered Plaintiff's post-hearing brief but did not respond to this statement. (Admin. Tr. 47; Doc. 11-2, p. 48) ("Additional correspondence and records were received at the hearing. This evidence has been reviewed and admitted into evidence as Exhibits 21E through 25E and 29F through 32 F."). To the extent Plaintiff intended, or the ALJ viewed, this statement as a request for further development of the record, it was therefore implicitly denied.

Plaintiff argues that she fairly raised the question of whether her impairments equaled the severity of a listing and "[t]he ALJ did not articulate why he chose not to obtain a medical opinion on medical equivalency." (Doc. 14, p. 8). Plaintiff's argument requires us to consider whether remand is required because the ALJ did not explain his implicit rejection of Plaintiff's request for medical expert review. In doing so, we apply a familiar standard. We must determine whether the ALJ's

decision is well-explained enough so that a reviewing court may know the basis for his conclusion.[45]

Applying this familiar standard, we are not persuaded that remand for an explanation of the ALJ's choice is required. The record in this case includes findings by medical consultants and psychological consultants issued during the initial and reconsideration stages of administrative review. Medical and psychological consultants are "highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the Act."[46] They are responsible for considering medical equivalence at the initial and reconsideration stage.[47] Although these experts also did not articulate their finding about medical equivalence, the administrative decisions finding Plaintiff "not disabled" were each signed by a medical consultant. (Admin. Tr. 144-185; Doc. 11-3, pp. 2-43). Multiple courts have found that a medical consultant's finding that a claimant is "not disabled" constitutes probative evidence of a lack of medical equivalence.[48] We

---

[45] *Cotter*, 642 F.2d at705; *see also* SSR 17-2p, 2017 WL 3928306 (explaining that an ALJ need not articulate why a combination of impairments does not equal a listing at step three, so long as his reasoning can be easily determined in the subsequent steps of his analysis).

[46] SSR 17-2p, 2017 WL 3928306, at *3.

[47] *Id.*

[48] *Gibson*, 643 F.Supp.3d at 89-90 (citing *Phelps v. Astrue*, No. 10-CV-240, 2011 WL 2669637, at *5 (D.N.H. July 7, 2011) ("the state agency physician's

similarly find that the psychological consultant findings, which include PRT assessments of three mild and one moderate limitation in the four relevant areas, are also probative evidence of a lack of medical equivalence to the mental disorder listings. Thus, the record in this case includes probative evidence that Plaintiff's impairments do not meet a listing.

Plaintiff is correct that under SSR 17-2p, an ALJ may ask for and consider evidence from medical experts when evaluating medical equivalence at step three. However, nothing suggests further development of the record was required in this case.[49] There was probative evidence that the combination of Plaintiff's impairments did not equal a listing in the record, and that evidence was entirely consistent. Thus, it is clear why the ALJ did not request an opinion about medical equivalency in this case. Therefore, we are not persuaded remand for further explanation of the ALJ's choice is required.

---

opinion that claimant was not disabled constitutes probative evidence of a lack of equivalence.")).

[49] 20 C.F.R. § 416.920b (explaining that an ALJ may take action to develop the record where there is insufficient evidence to determine whether a claimant is disabled or not, or where the evidence is so inconsistent or ambiguous that the ALJ cannot determine whether a claimant is disabled or not).

### C.    WHETHER REMAND IS REQUIRED BECAUSE THE ALJ DID NOT ARTICULATE HIS MEDICAL EQUIVALENCY DETERMINATION

At step three of the sequential evaluation process, the ALJ concluded that Plaintiff did "not have an impairment or combination of impairments that [met] or medically [equaled] the severity of one of the listed impairments. (Admin. Tr. 49; Doc. 11-2, p. 50). He then articulated why he found that Plaintiff did not have an impairment or combination of impairments that *met* listings 7.05 (sickle cell disease, thalassemia, and their variants), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.08 (personality and impulse-control disorders).

Plaintiff argues that the ALJ did not adequately articulate "if and why the combination of Plaintiff's [sickle cell anemia, and mental health impairments] together equals the severity of" listings 12.00 *et seq*. (Doc. 14, p. 8).[50]

In response, the Commissioner argues that the ALJ "specifically reasoned that the detailed listing requirements, both medical and durational, were not equaled when compared to the medical evidence of record." (Doc. 15, p. 11) (citing Admin.

---

[50] *See* POMS DI 24583.010(A)(3) ("It is generally not appropriate to medically equal a mental disorders listing using a combination of physical and mental impairments. However, in appropriate cases where the mental effects of multiple physical and mental disorders cannot be separated, it may be appropriate to consider medical equivalence using a combination of physical and mental impairments.")

Tr. 49-52; Doc. 11-2, pp. 50-53). He then suggests that the ALJ's reasoning is clear based on the articulation set forth in the subsequent sections of his decision. (Doc. 15, pp. 14).[51] We agree.

The Commissioner's policy is clear that an ALJ is not required to articulate why a combination of impairments *does not* equal a listing in his step three analysis.[52] Thus, to the extent Plaintiff argues this is an error, we are not persuaded. She does not develop the issue of whether the ALJ's analysis at the subsequent steps is sufficient to permit meaningful review of the basis for his medical equivalency determination. Absent any specific argument, we conclude that it is.

In his RFC analysis, the ALJ discussed the prior administrative medical findings by each medical and psychological consultant. The medical consultants concluded that Plaintiff was "not disabled" at both the initial and reconsideration levels. Those conclusions are consistent with one-another and are probative evidence to support the ALJ's conclusion that the combination of Plaintiff's impairments does not equal a listing. The ALJ found that the medical consultants' opinions, which support a conclusion that the combination of Plaintiff's impairments did not equal a

---

[51] In addition, the Commissioner argues that Plaintiff did not meet her burden of showing that the error alleged (failure to articulate why the combination of her impairments did not equal a listing is harmless, because Plaintiff did not provide any evidence to suggest that her impairments do in fact equal a specific listing).

[52] SSR 17-2p, 2017 WL 3928306, at 4.

listing, were persuasive. Thus, we find that the ALJ's decision is sufficient to permit review of his medical equivalency finding. Remand is not required for further explanation of the ALJ's conclusion that the combination of Plaintiff's impairments did not equal listings 12.00 *et seq.*

D.   **WHETHER REMAND IS REQUIRED BECAUSE THE ALJ DID NOT ADEQUATELY ARTICULATE HIS ANALYSIS OF LISTING 7.05**

At step three of the sequential evaluation process, the ALJ considered whether Plaintiff's sickle cell anemia met listing 7.05. The ALJ articulated his conclusion as follows:

> The claimant's sickle cell disease and systemic inflammatory response syndrome were evaluated under 7.00 of the listings. In order to meet the listing for 7.05 (Sickle cell disease, thalassemia, and their variants), there must be: documented painful (vaso-occlusive) crises requiring parenteral narcotic medication, occurring at least six times within a 12-month period with at least 30 days between crises; or complications of hemolytic anemia requiring at least three hospitalizations within a 12-month period and occurring at least 30 days apart; or hemoglobin measurements of 7.0 grams per deciliter or less, occurring at least three times within a 12 month period with at least 30 days between measurements; or beta thalassemia major requiring life-long red blood cell transfusions at least once every six weeks to maintain life.

(Admin. Tr. 50; Doc. 11-2, p. 51).

Although the above-quoted passage sets out the criteria of listing 7.05, it provides no meaningful explanation of why Plaintiff does not meet this listing. In her reply brief, Plaintiff argues that the ALJ's failure to articulate the basis for this

conclusion requires remand. (Doc. 16, p. 1). We agree that the ALJ's lack of discussion is an error, but it does not require remand.

The ALJ's discussion of Plaintiff's treatment records suggests that Plaintiff's last transfusion was in December 2018, and her hemoglobin levels were never recorded as 7.00 grams per deciliter or less. The ALJ references sickle cell crises where Plaintiff was hospitalized and administered parenteral narcotic medication in his summary of the records, but she was not hospitalized six times in a twelve-month period due to sickle-cell crisis.[53] The summary also does not suggest Plaintiff's impairment resulted in three 48-hour hospitalizations due to serious sickle cell complications in a 12-month period.[54] Accordingly, we find that the basis for the ALJ's step three conclusion is clear. Moreover, even if we were to find that the ALJ did not adequately explain his conclusion, when appealing a final administrative

---

[53] The ALJ identified the following sickle cell "crises": April 2018 (treated outpatient with oral pain medication), July 2018 (treated with IV pain medication in a hospital), October 2018 (treated with IV pain medications in a hospital), April 2020 (treated at home with oral pain medication), February 2021 (treated with IV pain medication in a hospital). (Admin. Tr. 54-55, Doc. 11-2, pp. 55-56); *see also* (Admin. Tr. 776, 876; Doc. 11-7, pp. 248, 348) and (Admin. Tr. 2326, 3591, 3709; Doc. 11-8, pp. 55, 1320, 1438).

[54] *See* 20 C.F.R. Part 404, Subpart P, Appendix 1-A2 § 7.00(C)(2) ("Examples of complications of hemolytic anemia that may result in hospitalization include osteomyelitis, painful (vaso-occlusive) crisis, pulmonary infections or infarctions, acute chest syndrome, pulmonary hypertension, chronic heart failure, gallbladder disease, hepatic (liver) failure, renal (kidney) failure, nephrotic syndrome, aplastic crisis, and stroke).

decision to federal court, the party alleging error bears the burden of showing an error was harmful.[55] Thus, to prevail, Plaintiff must show that the record contains evidence demonstrating some possibility that listing 7.05 is met. Plaintiff, however, offers no answer as to how she might have prevailed at step three if the ALJ's analysis of listing 7.05 was more thorough.

### E.   WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S CONCLUSION THAT PLAINTIFF DOES NOT MEET THE PARAGRAPH B CRITERIA OF LISTINGS 12.04, 12.06 OR 12.08

One way to meet listings 12.04, 12.06, and 12.08, is by satisfying the requirements set forth in paragraph A and paragraph B of those listings.[56] The paragraph B criteria for these three listings are identical.[57] The analysis at paragraph B involves an assessment of four areas: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting and managing oneself.[58] To *meet* paragraph B, a claimant's

---

[55] *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (requiring that a social security plaintiff explain how the error to which he points could have made any difference); *see also Coy v. Astrue,* No. 8-1372, 2009 WL 2043491 at *14 (W.D. Pa. Jul. 8, 2009) ("No principle of administrative law "require[s] that we convert judicial review of agency action into a ping-pong game" in search of the perfect decision.") (citing *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 766 n. 6 (1969)).

[56] 20 C.F.R. Part 404, Subpart P, Appendix 1-A2 § 12.00(A)(2).

[57] 20 C.F.R. Part 404, Subpart P, Appendix 1-A2 § 12.00(A)(2)(b).

[58] *Id.*

mental disorder must result in an extreme limitation in one of the four areas, or a "marked" limitation in two of the four areas. This case involves the ALJ's conclusions as to two of the four areas; interacting with others and adapting and managing herself.

"Interacting with others" is one of the four "paragraph B" criteria used to evaluate the mental disorder listings at step three. The Commissioner's regulations explain that "[t]his area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public."[59] Examples of interacting with others include: !!

> Cooperating with others; asking for help when needed; handling conflicts with others; stating your own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning.[60]

The ALJ concluded at step three that Plaintiff had "moderate" difficulty interacting with others. He provided the following explanation to support his conclusion:

> The claimant testified she becomes anxious in crowds of people, she verbally reacts instantaneously, and she has had conflicts with others

---

[59] 20 C.F.R. Part 404, Subpart P, Appendix 1-A2 § 12.00(E)(2).
[60] *Id.*

[Hearing Testimony]. The claimant reported that she does not spend time with others and she has problems getting along with others; however, she also indicated that she gets along with authority figures "okay" [Exhibit 5E/6-8]. Ms. Frederick Vazquez noted that the claimant can be confrontational, but she has been managing well, and it is a work in progress [Exhibit 23E/3]. Records indicate that the claimant had engaged in verbal altercations and she was aggressive, combative, and threatening [Exhibits 4F/10, 22F/48 and 27F/11]. However, mental status examinations indicated that the claimant was cooperative and pleasant [Exhibits 13F/15, 16, 22F/49, 30F/2, 31F/51, and 32F/12]. Dr. Cole indicated that the claimant was cooperative and her manner of relating was adequate [Exhibit 11F/4]. Drs. Franks and Timchack opined that the claimant had a mild limitation in interacting with others [Exhibits 1A/9 and 3A/10]. The undersigned finds that the record supports a finding of a moderate limitation in interacting with others.

(Admin. Tr. 51; Doc. 11-2, p. 52).

Adapting and managing oneself is also one of the four "paragraph B" criteria used to evaluate the mental disorder listings at step three. The Commissioner's regulations explain that "[t]his area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting."[61] Examples of "adapting and managing oneself" include: !

Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal

---

[61] 20 C.F.R. Part 404, Subpart P, Appendix 1-A2 § 12.00(E)(4).

hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.[62]

The ALJ concluded at step three that Plaintiff had a "mild" limitation adapting and managing herself. He provided the following explanation to support his conclusion:

> The claimant testified that she is not in mental health therapy because it is not in person and she is not comfortable doing it over the phone [Hearing Testimony]. The claimant alleged that she handles stress badly, she does not handle changes in routine well, and her medications cause side effects, including dizziness, drowsiness, and tiredness [Exhibit 5E/8, 9]. Ms. A. Frederick Vazquez, the claimant's mother, indicated that the claimant does well unless she is in crisis, but she is learning coping skills and will ask for assistance when she needs it [Exhibit 23E/2, 3]. Records in evidence indicate the claimant's insight and judgment ranged from fair to good [Exhibits 22F/1 and 26F/3]. Dr. Cole reported that the claimant's insight and judgment were fair [Exhibit 11F/5]. Drs. Franks and Timchack opined that the claimant had a mild limitation in adapting or managing oneself [Exhibits 1A/9 and 3A/10]. The undersigned finds that the record supports a finding of a mild limitation in adapting or managing oneself.

*Id.*

In her opening brief, Plaintiff argues, in one sentence, that substantial evidence does not support the ALJ's step three analysis of the paragraph B criteria because "[t]he ALJ disregarded evidence of marked limitations with interacting with others, despite acknowledging verbal altercations and she was aggressive,

---

[62] *Id.*

combative, and threatening, simply because the claimant was cooperative and pleasant." (Doc. 14, p. 9) (citing Admin. Tr. 51; Doc. 11-2, p. 52).

The Commissioner responded that this argument was underdeveloped because Plaintiff did not cite to any evidence to support it, and that Plaintiff did not meet her burden of showing that this error was harmful because one "marked" limitation in the paragraph B criteria did not undermine the ALJ's conclusion that Plaintiff did not meet listings 12.04, 12.06, and 12.08.

In reply, Plaintiff brought a new argument, and cited evidence which she believes undermines the ALJ's paragraph B criteria analysis. Specifically, she argues that substantial evidence does not support the ALJ's step three analysis of listings 12.04, 12.06, and 12.08 because the ALJ erred in his analysis of *two* of the paragraph B criteria (interacting with others and adapting or managing oneself). She argues substantial evidence does not support the ALJ's analysis because: (1) the medical sources did not have access to these records when they formed their opinion about Plaintiff's limitations in the paragraph B areas; (2) the ALJ did not discuss exhibits 19E or 22E (Court and Criminal records) in his decision; (3) the ALJ relied on sporadic reports of cooperative clinical encounters while ignoring reports of

uncooperative encounters; and (4) the ALJ's paragraph B analysis is inconsistent with Dr. Cole's opinion. (Doc. 16, pp. 2-4).[63]

First, Plaintiff argues that substantial evidence does not support the ALJ's step three analysis because he did not discuss Exhibits 19E and 22E, and because the medical professionals (whose opinions he relied on to assess the criteria) also did not have the documents. Although Plaintiff alleges these *documents* were not

---

[63] These exhibits suggest that in April 2015, Plaintiff pleaded guilty to a summary offense of disorderly conduct (unreasonable noise) (based on a February 9, 2015 criminal complaint). (Admin. Tr. 476; Doc. 11-6, p. 185). In May 2015, Plaintiff pleaded guilty to M2 simple assault (based on a February 15, 2015 criminal complaint). (Admin. Tr. 465; Doc. 11-6, p. 174). In December 2015, a motion for a competency examination was filed. Plaintiff was also charged with and then pleaded guilty to a second M2 simple assault charge. (Admin. Tr. 454; Doc. 11-6, p. 163). Plaintiff's probation was revoked, and she was resentenced to two to six months and was immediately paroled. (Admin. Tr. 494; Doc. 11-6, p. 203). She was sentenced to 2 years of probation for the second charge. *Id.* In June 2016, Plaintiff violated her probation. (Admin. Tr. 456; Doc. 11-6, p. 165). Plaintiff was arrested, then transferred to SCI Muncy for a 60-day mental health evaluation. (Admin. Tr. 501; Doc. 11-6, p. 210). In October 2016, Plaintiff was accepted into mental health court. (Admin. Tr. 493; Doc. 11-6, p. 202). Although these events occurred *after* Plaintiff's alleged disability onset date, they occurred years *before* her protective filing date (which is the first date she could collect benefits).

In March 2019, Plaintiff's landlord sued her for unpaid rent. (Admin. Tr. 483; Doc. 11-6, p. 192). Judgment was entered in the landlord's favor. Plaintiff's hearing testimony suggests this dispute was related to the landlord's failure to make repairs in her apartment. In the same month, Plaintiff was charged with a series of drug-related offenses. (Admin. Tr. 445-452; Doc 11-6, pp. 154-161). Plaintiff pleaded guilty to misdemeanor use/possession of drug paraphernalia. (Admin. Tr. 447; Doc. 11-6, p. 156).

available to the consultative examiners and were not in the record before the medical and psychological consultants reviewed the file, it appears some of the *information* they contain was. The consultative examination report discusses Plaintiff's criminal history. Dr. Cole noted that Plaintiff left her job due to pending "PWID" (possession with intent to deliver) charges. (Admin. Tr. 3186; Doc. 11-8, p. 915). He noted that Plaintiff was evaluated at a prison in 2016. *Id.* Under "legal history," Dr. Cole noted:

> The claimant was arrested for two simple assault charges in 2016. She spent 6 months incarcerated. She has a pending PWID charge. She denied being on parole or probation.

(Admin. Tr. 3187; Doc. 11-8, p. 916).

Although the *court* records were not available, medical records from Muncy State Correctional Institution and Lycoming County Prison were available when the psychological consultants reviewed the evidence. Thus, these clinicians were aware that Plaintiff was incarcerated for a period and based on Dr. Cole's report and were aware of the nature of the charges. (Admin. Tr. 147; Doc. 11-13, p. 5) (medical records from Lycoming County prison received July 30, 2019); (Admin. Tr. 146; Doc. 11-3, p. 4) (medical records from SCI Muncy received August 6, 2019). Therefore, this evidence was considered by the medical sources when they issued their opinions about Plaintiff's ability to interact with others and manage herself.

On that issue, Dr. Cole (the consultative examiner) did not assess the paragraph B criteria. To the extent his opinion is relevant to these criteria, he found that Plaintiff would have "moderate to marked" difficulty interacting appropriately with the public, moderate difficulties interacting with supervisors and co-workers, and moderate difficulty responding to work situations and changes. (Admin. Tr. 3191; Doc. 11-8, p. 920). Dr. Franks and Dr. Timchack (the psychological consultants) both determined that Plaintiff would have mild difficulty interacting with others and mild difficulty adapting or managing herself. (Admin. Tr. 152, 174; Doc. 11-3, pp. 10, 32).

Second, Plaintiff argues that substantial evidence does not support the ALJ's evaluation of two of the paragraph B areas because he did not discuss these records. There is a significant distinction however, between *considering*, and *discussing*. We reviewed the decision, and she is correct that he did not discuss them. He was not required to.[64] He did, however, *consider* them. The ALJ stated he reviewed exhibit 22E. (Admin. Tr. 47; Doc. 11-2, p. 48) ("Additional correspondence and records

---

[64] *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."); *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001) ("'[W]e do not expect the ALJ to make reference to every relevant treatment note in a case where the claimant . . . has voluminous medical records. . . .'"). The record in this case, just short of 4,000 pages, is voluminous.

were received after the hearing. This evidence has been reviewed and admitted into evidence as Exhibits 21E through 25E . . . ."). He also stated that he *considered* "all the evidence." *Id.* We have no reason to doubt him. Furthermore, all the medical sources to evaluate Plaintiff's mental health-related limitations had access to information about her criminal history and found less than marked limitations across the two criteria at issue. Thus, we are not persuaded that the ALJ's failure to discuss Plaintiff's criminal history at step three undermines his conclusion.

Third, Plaintiff argues that the ALJ relied solely on sporadic reports of cooperative encounters with medical staff to support his evaluation of Plaintiff's ability to interact with others. She cites to no encounters to support her argument. Moreover, the ALJ acknowledged records showing Plaintiff had "engaged in verbal altercations and she was aggressive, combative, and threatening," in his step three analysis. (Admin. Tr. 51; Doc. 11-2, p. 52) (citing Exhibits 4F/10, 22F/48, and 27F/11). Those exhibits include: a treatment record where a clinician noted that Plaintiff became "irate," "loud," and "verbally abusive" when informed she likely would not qualify for FMLA, (Admin. Tr. 643; Doc. 11-7, p. 115); a treatment record noting there was a "verbal altercation" between Plaintiff and the pediatrics medical staff where she "threatened medical employees," and was "asked to leave the building or face a 302 in the emergency department," (Admin. Tr. 3531; Doc. 11-8,

p. 1260); and a record indicating that Plaintiff was outraged that no one would prescribe her narcotics, and "became aggressive, combative, and threatening" towards three staff members for "wasting her time." (Admin. Tr. 3604; Doc. 11-8, p. 1333). This demonstrates that the ALJ considered the evidence of behavioral issues but determined that it did not support a marked limitation.

Fourth, Plaintiff argues that the ALJ's step three analysis is inconsistent with Dr. Cole's opinion. She points out that Dr. Cole concluded Plaintiff "has a marked restriction with interacting appropriately with the public, and a moderate restriction with interacting appropriately with supervisor(s) and co-workers and in respond appropriately to work situations and changes in a routine work situation." (Doc. 16, p. 4). Dr. Cole did not directly address the paragraph B criteria. Moreover, even if the marked to moderate limitation in one activity could support a marked limitation in the entire area of interacting with others, a marked limitation in one area does not satisfy the paragraph b criteria.

Therefore, we are not persuaded by any of Plaintiff's arguments that substantial evidence does not support the ALJ's conclusion that Plaintiff did not meet listings 12.04, 12.06, and 12.08.

## F. WHETHER REMAND IS REQUIRED BECAUSE THE RFC OMITS SOME OF PLAINTIFF'S CREDIBLY ESTABLISHED LIMITATIONS

Plaintiff is correct that an ALJ's RFC assessment must incorporate all of Plaintiff's credibly established limitations. The failure to do so would undermine his conclusions at steps four and five of the sequential evaluation process. She argues that the following five limitations were improperly excluded from the ALJ's RFC assessment in this case: (1) unscheduled or additional breaks throughout the workday (frequency and duration unspecified); (2) being absent three days per month; (3) inability to follow rules 5% of the time; (4) inability to accept criticism from supervisors or co-workers 10-20% of the time; and (5) being off task 20% of the workday. (Doc. 14, pp. 9-13) (citing Admin. Tr. 101-102; Doc. 11-2, pp. 102-103).

First, she argues that remand is required because the ALJ did not discuss her education records from third and ninth grade. An ALJ, however, is not required to discuss every piece of evidence in the record. Remand may be appropriate where an ALJ disregards substantial probative evidence that conflicts with his conclusion without explanation.[65] Thus, regarding Plaintiff's first argument, we will evaluate

---

[65] *Cotter*, 642 F.2d at 706 (acknowledging that [i]t is difficult to separate the obligation to explain why certain evidence has been excepted from the obligation to explain why other significant probative evidence has been rejected."); *Fargnoli*, 247 F.3d at 43 ("Where there is conflicting probative evidence in the record, we

whether the education records she cites are substantial, whether they prove the existence of the limitations at issue, and whether they conflict with the ALJ's implicit conclusion that the limitations at issue are not present.

Second, Plaintiff argues that remand is required because the ALJ did not articulate why these limitations were rejected. An ALJ must articulate his findings in a written decision with sufficient particularity to permit meaningful review.[66] Thus, regarding Plaintiff's second argument, we will evaluate whether the ALJ's reasons for omitting these limitations from the RFC are clear based the decision itself and the evidence he expressly cites and credits.

### 1.   Unscheduled or Additional Work Breaks

Regarding the first limitation—unscheduled or additional breaks throughout the workday—Plaintiff argues:

---

recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such explanation is not provided."); *Johnson*, 529 F.3d at 204 ("[A]n ALJ may not reject pertinent or probative evidence without explanation, but need not "cite all evidence a claimant presents, including evidence that is irrelevant to her case."); *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.").

[66] *Cotter*, 642 F.2d at 706 (requiring that the ALJ "provide an adequate basis so that the reviewing court can determine whether the administrative decision is based on substantial evidence").

> Her sickle cell disease requires her to take breaks and keep hydrated. (Admin. Tr. 88-97; Doc. 11-2, p. 209) She must reduce her activity to avoid a crisis. (Admin. Tr. 88-97; Doc. 11-2, p. 209).

(Doc. 14, p. 10).[67] To support this limitation, she relies on hearing testimony, but does not cite to a particular statement. During her hearing, the ALJ asked Plaintiff about a new job she started recently. Plaintiff reported she was working twelve-hour shifts, approximately 30 hours per week. (Admin. Tr. 87; Doc. 11-2, p. 88). She typically had three days off per week. *Id.* The ALJ then asked why Plaintiff was having difficulty working on a continuous basis. Plaintiff responded "[w]hen I overexert my body, I go into crisis." (Admin. Tr. 88; Doc. 11-2, p. 89). The ALJ also asked if Plaintiff had any limitations when she was *not* experiencing a sickle cell crisis. Plaintiff reported that she could "do everything," and that she just doesn't overdo it, and "takes breaks periodically." (Admin. Tr. 89; Doc. 11-2, p. 90). The number and length of these "periodic" breaks was not discussed.

First, Plaintiff argues that remand is required because the ALJ did not discuss her school records before rejecting this limitation to "periodic" breaks. (Doc. 14, p.

---

[67] During the administrative hearing, Plaintiff's counsel asked a VE whether a person would be able to take unscheduled breaks throughout the workday. (Admin. Tr. 102; Doc. 11-2, p. 103). The VE responded that it depended on how often the breaks would occur, and how long they would last. *Id.* He speculated that unscheduled breaks are not *usually* allowed on a regular basis. *Id.*

12) (citing Admin. Tr. 322, 333, Doc. 11-6).[68] The two specific pages Plaintiff cites do not contain any information relevant to a need for periodic breaks. Therefore, we are not persuaded that this evidence is substantial, or that it is probative to the issue of whether Plaintiff would need periodic breaks. It also does not conflict with the ALJ's implicit conclusion that she does not require periodic breaks outside of those customarily provided during a regular workday. We will not remand for further consideration of these records.

Second, Plaintiff argues that remand is required because the ALJ did not articulate why Plaintiff's need for "periodic breaks" was excluded from the RFC assessment. We are not persuaded. The ALJ's decision is clear why this limitation does not appear in the RFC. Although Plaintiff generally testified, she took "periodic breaks," it is not clear whether she took these breaks while working twelve-hour shifts. The education records she cites do not demonstrate Plaintiff would need "periodic" breaks during the day to avoid triggering a sickle cell crisis. The ALJ relied on Plaintiff's treatment records and opinions by various medical sources to support his RFC assessment. None of the medical sources he relied on, and in fact no medical source that issued an opinion or administrative finding in this case, found

---

[68] Although Plaintiff also cites generally to Document 11-6, this document is a 238-page exhibit. We decline to parse that exhibit in search of evidence to support her argument.

that Plaintiff would need periodic breaks during the day to avoid triggering a sickle cell crisis. Reviewing the ALJ's decision, and considering the evidence the ALJ credited, it is clear why the "periodic breaks" were not incorporated in the ALJ's RFC assessment.

### 2.    Absent More than 3 Days Per Month

Regarding the second limitation—being absent three days per month—Plaintiff argues:

> She will be absent when she is experiencing a mild crisis or full-blown crises. She will also have increased absences due to her numerous and severe mental health impairments.

(Doc. 14, p. 11) (citing Admin. Tr. 88-97; Doc. 11-2, p. 209).[69] Regarding her sickle cell disease, Plaintiff testified that she experiences major crises four times per year, and minor crises at least once every two months. (Admin. Tr. 92; Doc. 11-2, p. 93). She said sometimes it takes up to one month to recover after a major crisis. (Admin. Tr. 90; Doc. 11-2, p. 91). More minor crises can last as little as one day. *Id.* Plaintiff cannot work during any crisis. (Admin. Tr. 93; Doc. 11-2, p. 94). Plaintiff suggests that her education records also document a "longstanding and consistent difficulty"

---

[69] Although framed in Plaintiff's brief as a limitation of "frequent absences," Plaintiff cites to a VE's testimony that a person absent three or more days per month would not be employable. We infer that this is the specific attendance limitation Plaintiff argues was wrongfully excluded from the RFC.

maintaining attendance. (Doc. 14, p. 12) (citing Admin. Tr. 322, 333, Doc. 11-6, p. 16).

First, Plaintiff argues that remand is required because the ALJ did not discuss her school records before implicitly rejecting this limitation. She cites to records documenting frequent school absences in kindergarten, first grade, second grade, and ninth grade.[70] Given its age, we are not persuaded that evidence of absenteeism in kindergarten, first grade, and second grade proves that Plaintiff would be unable to maintain regular attendance at age 23. The records from ninth grade, while not as outdated, do not indicate why Plaintiff was absent. Thus, its probative value is limited, as our inquiry here is whether Plaintiff would be absent because of her medically determinable impairments. Moreover, it is not "substantial" when measured against the other evidence of record. The ALJ summarized Plaintiff's treatment records, and those records do not illustrate frequent, long-term hospitalizations. Two psychological consultants assessed Plaintiff would be able to

---

[70] The records Plaintiff relies on include an IEP written when she was 16 years old. According to her instructor, Plaintiff was absent 18.5 days during the first marking period of the school year and was absent 13 days during the second marking period of the school year. (Admin. Tr. 322; Doc. 11-6, p. 31). The IEP does not specify whether those absences were due to illness. She also cites to an Initial Evaluation Report written when she was 9 years old. In this report it was noted that attendance was a concern because she missed 41 days of kindergarten, 17 days in 1st grade, and 26 days in second grade. (Admin. Tr. 332; Doc. 11-6, p. 41). The report does not specify whether those absences were due to illness.

maintain attendance. We will not remand this case for further consideration of these records.

Second, Plaintiff argues that the ALJ did not articulate why this limitation was excluded from the RFC assessment. We are not persuaded that remand is required because the ALJ's decision clearly demonstrates why this limitation was excluded. In his decision, the ALJ noted that Dr. Franks and Dr. Timchack assessed that Plaintiff would "be able to maintain regular attendance," despite her mental impairments. (Admin. Tr. 60; Doc. 11-2, p. 62). No other medical source suggested Plaintiff would have problems maintaining attendance, and the ALJ's summary of the sickle cell treatment does not reveal frequent or long-term hospitalizations. (Admin. Tr. 54-56; Doc. 11-2, pp. 55-57).

### 3. Inability to Follow Rules 5% of the Time and Inability to Accept Criticism 10% to 20% of the Time

Regarding the third and fourth limitations—inability to follow rules 5% of the time, and inability to accept criticism from co-workers or supervisors 10% to 20% of the time—Plaintiff argues that her:

> mental health impairments are likely to produce interactions with coworkers and supervisors that will preclude competitive employment. She testified about conflicts with coworkers at UPS due [sic] and others. (Admin. Tr. 88-97; Doc. 11-2, p. 209) She has criminally assaulted individuals. (Admin. Tr. 500; Doc. 11-6, p.50) The record is replete with examples of inappropriate behavior precluding her from meeting the demands of secure basic healthcare. (Admin. Tr. 88-97;

Doc. 11-2, p. 209) At times her behavior has been so extreme that
security or police have been called.

(Doc. 14, p. 11).[71] Plaintiff suggests that her education records demonstrate a

"longstanding and consistent" difficulty maintaining appropriate behavior. (Doc. 14,

p. 13) (citing Admin. Tr. 307, 322, 333, Doc. 11-6, p. 16).

First, Plaintiff argues that remand is required because the ALJ did not discuss

her school records before implicitly rejecting these limitations. We are not persuaded

that the evidence Plaintiff cites is substantial or proves these limitations exist.[72] The

first record references a non-disability-related behavioral issue in ninth grade. Thus,

it is not probative of whether her disabilities cause difficulty following rules and

responding appropriately to criticism. The second and third records relate to

Plaintiff's classroom behavior in third grade. These records are of little value to an

---

[71] Although framed in Plaintiff's brief as an argument that there were not
enough social interaction limitations in the RFC, Plaintiff cites to a VE's testimony
that a person unable to follow rules 5% of the time, and a person who would be
unable to accept criticism 10% to 20% of the time, would not be employable. We
infer that these are the additional limitations Plaintiff argues were incorrectly
excluded.

[72] The records Plaintiff cites include: her 9th grade IEP, which states Plaintiff
was being instructed in the Alternative Education setting "due to a behavioral issue
that occurred last school year that was not found to be a manifestation of her
disability" (Admin. Tr. 307; Doc. 11-6, p. 16); a teacher's observation in the 9th
grade IEP that Plaintiff was cooperative with her teachers, (Admin. Tr. 322; Doc.
11-6, p. 31); and a 3rd grade assessment where her teacher noted that she was very
pleasant, but had difficulty staying seated, remaining quiet when others are working,
and was stole from a classmate. (Admin. Tr. 333; Doc. 11-6, p. 42).

assessment of Plaintiff's ability to follow rules and accept criticism at age 23. We will not remand this case for further consideration of these records.

Second, Plaintiff argues that remand is required because the ALJ did not articulate why these limitations (difficulty following rules, and difficulty responding to criticism) were excluded from the RFC. We are not persuaded because the basis for the ALJ's conclusion is clear. No medical source assessed any degree of limitation regarding Plaintiff's ability to follow rules. Dr. Cole was the only source who found that Plaintiff had any significant difficulty interacting with others. He assessed that Plaintiff had "fair" ability to interact with co-workers and supervisors but would be seriously limited interacting with the public. This is consistent with, and supports, the ALJ's assessment that Plaintiff could have occasional (2 hours per day) interaction with co-workers and supervisors and no interaction with the public.

### 4.   Off Task 20% of the Time

Regarding the fifth limitation—being off task 20% of the time—Plaintiff states, that she "has difficulty completing tasks in a timely manner." (Doc. 14, p. 11). She suggests that, while in school, she was given extra time to complete assignments. (Doc. 14, p. 12) (citing Admin. Tr. 322, 333; Doc. 11-6).[73]

---

[73] Plaintiff argues that she has difficulty completing tasks in a timely manner. (Doc. 14, p. 13). She does not define the contours of the limitation she contends was improperly excluded from her RFC but does cite to VE testimony that an individual

First, Plaintiff argues that remand is required because the ALJ did not discuss her school records before implicitly rejecting this limitation. (Doc. 14, p. 13) (citing Admin. Tr. 307, 322, 333, Doc. 11-6, p. 16).[74] We are not persuaded that remand is required to discuss the records Plaintiff cites. When considering whether and to what extent Plaintiff can maintain concentration at age 23, records that Plaintiff had difficulty completing homework and other tasks at age nine is too remote and therefore has little probative value. Given the lack of detail in the ninth-grade record regarding the extent of the distraction or impact on Plaintiff's work, it is not especially probative of the limitation at issue. Moreover, when measured against the other evidence of record, which includes medical opinions that Plaintiff could complete one and two step tasks, evidence that Plaintiff was "distracted by others" in the classroom at age 16 is not substantial.

Second, Plaintiff argues that remand is required because the ALJ did not articulate why this limitation was excluded from the RFC assessment. We are not

---

who is off task 20% of the time cannot work. Thus, we infer that this is the limitation that was improperly excluded.

[74] These records include: an observation by her ninth-grade teacher that she "seemed quite distracted by others in the room," and was more focused away from the other students (Admin. Tr. 322; Doc. 11-6, p. 31); and an observation by a third-grade teacher that Plaintiff was having difficulty completing assigned tasks and did not consistently complete her homework (Admin. Tr. 333; Doc. 11-6, p. 42).

persuaded because the reason for the ALJ's conclusion is clear. In his decision, the ALJ acknowledged that Plaintiff's ability to maintain attention and concentrate was mildly impaired and was persuaded by the opinions of two psychologists that Plaintiff had the mental capacity to complete simple one or two step tasks. (Admin. Tr. 59-60; Doc. 11-2, pp. 60-61). He was also persuaded by an examining psychologist's opinion that Plaintiff only had mild limitations understanding, remembering, and carrying out simple instructions. *Id.* Thus, in the absence of any opinion or finding by a medical source that supports this limitation, substantial evidence supports the ALJ's decision to exclude it.

### G.   WHETHER THE ALJ DISREGARDED DR. KNEIFATI'S OPINIONS BASED ON HIS OWN LAY EVALUATION OF MEDICAL ISSUES

Dr. Kneifati examined Plaintiff on June 9, 2017 and July 25, 2019, at the Bureau of Disability Determination's request. (Admin. Tr. 620-633; Doc. 11-7, pp. 92-105); (Admin. Tr. 3195-3209; Doc. 11-8, pp. 925-938). After each examination he provided a report, check-box medical source statement, and range of motion chart.

In his June 2017 medical source statement, Dr. Kneifati assessed that Plaintiff could: frequently lift and carry up to ten pounds; occasionally lift and carry up to twenty pounds; sit up to four hours at one time and for a total of five hours per eight-hour workday; stand up to two hours at one time and for a total of three hours per

eight-hour workday; and walk up to one hour at one time and for a total of two hours per eight-hour workday; continuously reach, handle, finger, feel, push/pull; and occasionally operate foot controls, climb stairs, climb ramps, climb ladders, balance, stoop, kneel, crouch, and crawl. (Admin. Tr. 620-633; Doc. 11-7, pp. 92-105). He assessed that Plaintiff could "frequently" tolerate exposure to dusts, odors, fumes, and pulmonary irritants, but could only "occasionally" tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, extreme cold, or extreme heat. *Id.*

In his July 2019 medical source statement, Dr. Kneifati assessed that Plaintiff could: occasionally lift and carry up to ten pounds; not lift or carry any amount of weight frequently; sit up to three hours at one time and for a total of four hours per eight-hour workday; stand for two hours at one time and for a total of three hours per eight-hour workday; walk for one hour at a time and for two hours per eight-hour workday; frequently reach, handle, finger, feel, push/pull, climb stairs, climb ramps, and crawl; and occasionally operate foot controls, climb ladders, climb scaffolds, balance, stoop, kneel, and crouch. (Admin. Tr. 3195-3209; Doc. 11-8, pp. 925-938). He checked boxes indicating that Plaintiff could: hear and understand simple oral instructions and communicate simple information; use a telephone to communicate; avoid ordinary hazards in the workplace; read an ordinary newspaper

or book; and view a computer screen. *Id.* He noted Plaintiff could not read very small print due to poor vision. He assessed that Plaintiff could "continuously" tolerate exposure to dusts odors, fumes, pulmonary irritants, and vibrations, but could only "occasionally" tolerate exposure to unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, wetness, extreme cold, or extreme heat. *Id.*

The ALJ found Dr. Kneifati's opinions unpersuasive because:

> Dr. Kneifati's own examination revealed that the claimant exhibited reduced ranges of motion in her lumbar spine; however, her remaining ranges of motion were all within normal limits and her strength was 5/5 in her upper and lower extremities [Exhibits 3F/5, 15-16 and 12F/5, 14-17]. Thus, the undersigned finds that Dr. Kneifati overestimated the claimant's limitations in sitting, standing, and walking, as well as in postural maneuvers and the operation of foot controls. As indicated above, additional physical examinations revealed the claimant had no motor deficit, no sensory deficit, and her ranges of motions were within normal limits [Exhibits 5F/7, 261 30F/2, and 31F/24]. Thus, the undersigned finds that the record supports fewer limitations, including postural limitations, than those opined by Dr. Kneifati.

(Admin. Tr. 59; Doc. 11-2, p. 61).

Then, the ALJ discussed prior administrative findings by two medical consultants (Crescenzo Calise, M.D., and Kurt Maas, M.D.). These consultants assessed that that Plaintiff could: occasionally lift and carry 20 pounds; frequently lift and carry ten pounds; sit, stand, and walk for up to six hours (for each) per eight-hour workday; frequently climb ramps, climb stairs, balance; and occasionally climb ladders, climb ropes, climb scaffolds, stoop, kneel, crouch, and crawl. (Admin. Tr.

156-159, 177-180; Doc. 11-3, pp. 14-17, 35-38). They found Plaintiff had no

manipulative (i.e., reaching, handling, fingering, and feeling) limitations. *Id.* They

also suggested Plaintiff avoid concentrated exposure to extreme cold, extreme heat,

humidity, and hazards. *Id.* The ALJ found these assessments "persuasive" because:

> consultative physical exams revealed the claimant's gait and stance
> were normal, and she was able to walk on heels and toes without
> difficulty [Ex. 3F/4 and 12F/4]. In addition, the claimant's strength was
> 5/5 in her upper and lower extremities, thereby supporting work at the
> light exertional level in accordance with Drs. Calise's and Maas's
> opinions [Ex. 3F/5, 15-16 and 12F/5, 14-17].

(Admin. Tr. 59; Doc. 11-2, p. 60). Put simply, the ALJ concluded that Dr. Kneifati's

examination findings were more consistent with the consultants' findings than they

were with Dr. Kneifati's medical source statement.

Plaintiff argues:

> [T]he ALJ finds that Dr. Kneifati overestimated [Plaintiff's] limitations
> based upon other parts of Dr. Kneifati's same report. (Admin. Tr. 59,
> Doc. 11-2, p. 60) In doing so, he in fact supplanted those opinions with
> her [sic] own speculation and observation. That is reversible error.

(Doc. 14, p. 13) (citing *O'Keefe v. Colvin*, No. 12-3486 (E.D. Pa. July 20, 2015)

(quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000))).

Plaintiff is correct that an ALJ is not permitted to disregard a medical opinion

based on his own credibility judgments, speculation, or lay opinion based *solely* on

his own "amorphous impressions gleaned from the record and from his evaluation

of the claimant's credibility."[75] We are not, however, persuaded that the ALJ disregarded Dr. Kneifati's opinion based solely on his own impressions in this case. For example, in the case Plaintiff cites, *O'Keefe v. Colvin*, the ALJ "essentially diagnosed [a claimant] with depression even when the psychiatrists who examined him, treated him, or reviewed his medical file, determined [the claimant's] symptoms were the result of either an organic mental disorder or bipolar disorder."[76] Here, the ALJ did not rely on his own lay evaluation, and instead chose between a competing medical opinion and prior administrative medical findings. He assessed their supportability and consistency and reached a conclusion that Plaintiff disagrees with. This choice, between different qualified medical professionals exercising *their* judgment, however, is not improper.[77] It also contradicts Plaintiff's argument that the ALJ rejected this medical opinion based on his lay opinion.

---

[75] *Morales*, 225 F.3d at 316-318; *see also Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong.").

[76] *O'Keefe v. Colvin*, No. 12-3486, 2015 WL 4496572, at *4 (E.D. Pa. July 20, 2015).

[77] *Cotter*, 642 F.2d at 705 ("[W]hen the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them.").

## V.     CONCLUSION

Accordingly, for the reasons explained in this Memorandum Opinion:

(1)     The Commissioner's final decision is AFFIRMED.

(2)     Final judgment in the Commissioner's favor will be issued separately.

(3)     Appropriate orders will be issued.

Date: October 16, 2024                    BY THE COURT

                                          *s/William I. Arbuckle*
                                          William I. Arbuckle
                                          U.S. Magistrate Judge